MICHAEL BAILEY
United States Attorney
District of Arizona
MATTHEW G. ELTRINGHAM
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: matthew.eltringham@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States America,<br><br>  Plaintiff,<br><br>vs.<br><br>Abdalkader Alghaithi,<br><br>  Defendant. | CR No. 16-01430-02-TUC-JGZ (LCK)<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

Now comes the United States of America, by and through its attorneys undersigned, and submits the following in regards to the above-captioned defendant's sentencing. The sentencing is currently set for October 22, 2019.

*Facts:*

The government agrees with the facts as set forth in the Pre-Sentence Report ("PSR") paragraphs 1 through 7, inclusive, and 20 through 26, inclusive, and incorporates them in their entirety by reference. Additionally the government proffers the following additional facts contained in the disclosure as it relates to the defendant's actions in furtherance of this conspiracy, and incorporates the trial testimony in its entirety.

*Background*

In November of 2014, Special Agents ("SA") from the U.S. Drug Enforcement Agency ("DEA") began investigating the distribution of synthetic cannabinoids in Tucson, Arizona. By June of 2015, agents identified what appeared to be three distinct groups who were distributing synthetic cannabinoids. For ease of reference and consistency these

groups are referred to as the Alghaithi, Qasem, and Shahin drug trafficking organizations ("DTO").[1]  Agents were also able to identify the source of supply for these three DTOs, the Khaleq DTO, which operated out of Denver, Colorado, and Long Beach, California.

During the investigation, the government was permitted to intercept wire and electronic communications, in the form of text messages, from various members of these DTOs.  The court authorized wire and electronic intercepts laid out the inner workings of these organizations, along with how they would resupply the synthetic cannabinoids when they were running low.

### *The Source of Supply - Khaleq Drug Trafficking Organization (16-CR-1431)*

The Khaleq DTO was comprised of Naji Abdalkhaleq, Madji Khaleq, Ana Patricia Hidalgo-Hernandez, and others.  Abdalkhaleq is the father of Khaleq.  During the investigation it was determined that this DTO was the source of supply for the Alghaithi DTO, Qasem DTO, and Shahin DTO, along with another DTO in Texas.  Members of the Khaleq DTO are charged in 16-CR-1431-TUC-JGZ.

The investigation showed that Khaleq would order the raw synthetic cannabinoids from China.  These cannabinoids would be shipped to the United States and were improperly labeled as cleaning supplies, or some other innocuous label, to avoid law enforcement attention.  The shipments of the synthetic cannabinoids were sent to a warehouse in Long Beach, California, which was owned and operated by Abdalkhaleq and Khaleq.  Ana Patricia Hidalgo-Hernandez was the person who practically ran the warehouse.  She, and others at the warehouse, would receive the raw synthetic cannabinoids then process the raw chemicals so the raw synthetic cannabinoids would bond to organic plant matter resulting in an ingestible product, or mix the raw synthetic cannabinoids with oils to make a liquid which could be ingested using "e-cigarettes."  Once the synthetic cannabinoids were in an ingestible state, they were packaged and sorted for distribution.

---

[1] Members of the Qasem DTO are charged in 16-CR-1433-TUC-JGZ and members of the Shahin DTO are charged in 16-CR-1432-TUC-JGZ.

The synthetic cannabinoids were shipped on thirteen separate occasions via Federal Express ("FedEx") from a location in, or near, Long Beach California to the defendant's residence at 3975 E. Agate Knoll, in Tucson. The return addresses on each of the shipping labels were fictitious. The shipping address was correct, however the recipient's name was also fictitious. The defendant admitted to receiving all but one of the shipments of synthetic cannabinoids at his residence.[2] The defendant further admitted that the shipments of synthetic cannabinoids were the only shipments he received at the residence for the Chihuahua Market.

Either Abdalkhaleq or Khaleq would travel from Colorado to Tucson to pick up payments for the sale of the synthetic cannabinoids. This practice stopped in September 2016 when Khaleq was encountered at the Tucson International Airport attempting to board a flight to Colorado with approximately $40,000 in cash in a backpack. DEA seized the cash as proceeds of the synthetic cannabinoids, however the money was ordered returned by the Pima County Superior Court. After this seizure, the exchange of money for synthetic cannabinoids occurred in California. The exchange typically occurred with Hidalgo-Hernandez, who was acting in concert with either Abdlkhaleq or Khaleq.

***This conspiracy – Alghaithi Drug Trafficking Organization***

During the course of the investigation into the Najib and Abdulkader Alghaithi DTO the government determined that Najib Alghaithi was the owner of the Chihuahua Market. Based on various encounters in the Chihuahua Market is was determined that on its face the market sold legitimate items, such as snacks, sodas, and other items used to ingest tobacco. It was also determined that Najib Alghaithi was the owner of the liquor license for the Chihuahua Market, which permitted the sale of certain alcoholic beverages. The defendant was a clerk who consistently worked at the market.

Based on the investigation, and evidence presented at trial, it was determined that the defendant and Najib Alghaithi were business partners in the distribution of synthetic cannabinoids from the Chihuahua Market. For example, on October 30, 2015, a

---

[2] The one shipment he did not receive was interdicted by law enforcement.

confidential source[3] ("CS") entered the Chihuahua Market and asked the defendant if he sold "potpourri" - which is code on the street for synthetic cannabinoids. The defendant told him to come back in 20 minutes. The CS left the store and returned as requested. At this point, the defendant provided him one packet of synthetic cannabinoids for $20. After leaving the store and meeting with agents, the CS produced one 3-gram packet of spice labeled "Diablo." The packet was sent to the lab and it tested positive for 5F-ABICA and AB-PINACA. AB-PINACA is a Schedule I controlled substance.

On November 5, 2015, and December 23, 2015, the CS purchased synthetic cannabinoids from the defendant in the Chihuahua Market. On November 5 the CS purchased ten packets of spice labeled "Diablo Gold" for $200. The packets all contained AB-CHMINACA,[4] AB-PINACA,[5] and XLR-11.[6] All three substances are Schedule I controlled substances.

On December 23 the CS purchased 100 packets of synthetic cannabinoid labeled "Diablo Gold." The packets all contained AB-CHMINACA, AB-PINACA, XLR-11. On this same day the defendant provided a sample packet of synthetic cannabinoid labeled "Klimax." This packet contained 5F-AMB.[7] All four substances are Schedule I controlled substances.

### ***The defendant***

During the course of the investigation, and testimony at trial, it was determined that the defendant is a clerk at the Chihuahua Market. It was also determined that he conducted sales of synthetic cannabinoids in the Chihuahua Market with Najib Alghaithi's knowledge. The court authorized wire and electronic intercepts, some of which are summarized below, support this notion.

---

[3] The government used three different confidential sources during the course of this investigation. Unless stated otherwise, the references to "CS" refer to CS-1.
[4] AB-CHIMNACA became a Schedule I controlled substance in January 2015.
[5] AB-PINACA became a Schedule I controlled substance in January 2015.
[6] XLR-11 became a Schedule I controlled substance in May 2013.
[7] 5F-AMB became a Schedule I controlled substance in February 2017.

It is noteworthy that on May 2, 2016, defendant called the Najib Alghaithi.[8]  The parties discussed the shipment of synthetic cannabinoids, part of which was lost.  Najib Alghaithi said he did not believe Khaleq about the loss of synthetic cannabinoids because the defendant did not make such a big order.  The defendant said that Khaleq split the loss 50/50.  Najib Alghaithi said that Khaleq should have waited for one package to be delivered before he sent the second.

It is clear from the trial that the defendant was more than a clerk at the Chihuahua Market.  He knew about the sales of, and did sell, synthetic cannabinoids within the market.  He is knowledgeable about where the synthetic cannabinoids were being obtained, because in fact he ordered them from Madji Khaleq. Additionally, the synthetic cannabinoids were shipped to the defendant's residence, 3945 E. Agate Knoll, Tucson.  The synthetic cannabinoids were transported from the residence to the Chihuahua Market where the synthetic cannabinoids were sold.

### ***The conversion ratio of 1:167 is fairly applied in this case***

All of the drugs involved in this case are not listed on the Drug Quantity Table, therefore the Court should use the Drug Equivalency Table to determine the appropriate Base Offense Level.  See, U.S. Sentencing Guidelines § 2D1.1 cmt. n. 6 and 8.  Therefore, the court, "must 'determine the base offense level using the marihuana equivalency of the most closely related substance referenced in this guideline.'" *United States v. Nahmani*, 2017 WL 3446753 at 15 – 16 (11th Cir. 2017); quoting U.S.S.G. § 2D1.1 cmt. n.6.  The Supreme Court has indirectly addressed this issue in *McFadden v. United States*. (135 S.Ct. 2298, 2305 (2015).)  The Supreme Court identified three factors in determining if a substance falls under the definition of a controlled substance analogue.  These factors mirror the factors enumerated in the U.S.S.G. § 2D1.1 cmt. n.6 and were again recognized by the Eleventh Circuit in *Nahmani*.  In short the factors are: (1) whether the chemical

---

[8] The Court authorized the interception of wire and electronic communications on the phones of Abdulkader Alghaithi from April 13, through May 13, 2016.  The intercepts from Abdulkader Alghaithi's phone implicated him in the day to day management of the sale of spice from the Chihuahua Market.

structure of the substance is substantially similar to that of a controlled substance; (2) whether the controlled substance not reference has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is similar to that of a controlled substance in schedule I or II; (3) whether the controlled substance not referenced has an effect on the central nervous system which is substantially similar to, or greater than, that of a controlled substance in schedule I or II.  See *McFadden*, 135 S.Ct. at 2304 – 2305; *Nahmani*, 2017 WL 3446753 at 16; *United States v. Singh-Sidhu*, 2017 WL 1364582 at 4 (D.NV., 2017).

The jury found that all of the synthetic cannabinoids in this case have a chemical structure that is substantially similar to that of a controlled substance; that the synthetic cannabinoids in this case have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is similar to that of a Schedule I controlled substance; also that the stimulant, depressant, or hallucinogenic effect on the central nervous system is substantially similar or greater than that of a Schedule I controlled substance.  It is the government's position that the most closely related controlled substance on the Drug Quantity Table is tetrahydrocannabinol (commonly referred to as "THC").

Dr. Prioleau testified that the synthetic cannabinoids in this investigation have a stimulant, depressant, or hallucinogenic effect on the central nervous system and that the stimulant, depressant or hallucinogenic effect on the central nervous system is substantially similar or greater than that of a Schedule I controlled substance.

It should be noted that XLR-11 has been previously determined to be closely related to THC.  See, *United States v. Hurley*, 842 F.3d 170, 173 (1st Cir. 2016), *United States v. Novak*, 841 F.3d 721 at 730 (7th Cir. 2016), *United States v. Malone*, 828 F.3d 331, 337-38 (5th Cir. 2016), *United States v. Ramos*, 814 F.3d 910, 919 (8th Cir. 2016).

It is the government's position that the conversion ratio as provided for in the U.S. Sentencing Guidelines, Drug Equivalency Table, is appropriate in determining the appropriate base offense level.  Based upon the proffered facts and case law, the synthetic cannabinoids in this case most closely related to that of THC.  Therefore, the conversion

1  ratio of 1:167 is appropriate.  However, the Court maintains the discretion to vary
2  downward as it may deem appropriate in light of the sentencing factors as they relate to
3  this defendant.  See *Hurley*, 842 F.3d at 172 (district court finding ratio of 1:167 applied
4  but departed downward "citing the harshness of the 1:167 conversion ration as a reason for
5  varying the sentence[]").

### *Analysis of the 18 U.S.C. § 3553(a) factors*

When fashioning an appropriate sentence, there are certain factors which are to be considered by the Court.  Those factors are contained in 18 U.S.C. §3553(a).  ("3553 factors.")  In pertinent part they are that "[t]he court…shall consider – (1) the nature and circumstance of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant…"

Looking at the 3553 factors, the defendant is a Criminal History Category I.  This marks the first criminal conviction in the United States for this defendant.

The nature and circumstances of this conspiracy are troubling.  The defendant was using the Chihuahua Market as a cover to sell synthetic cannabinoids.  He was also in direct communication with the source of supply, Madji Khaleq, to keep the market stocked with synthetic cannabinoids.

This is a serious offense as some individuals who ingested synthetic cannabinoids became unconscious, vomited, had seizures and many have required medical attention.

The sentence imposed should take into account the serious nature and circumstances of the offenses. The presentence report correctly notes that the sentence imposed should address the seriousness of the offense, protect the public from further crimes of the defendant, provide just punishment for the offense, afford adequate deterrence to criminal conduct, promote respect for the law and to provide the defendant with needed educations

or vocational training, medical care, or other correctional treatment in the most effective manner.

The presentence reports correctly calculates the total offense level of 32. The presentence reports suggests that the defendant be sentenced to a period of 36 months imprisonment followed by three years of supervised release and a $2,000 fine. The presentence reports also recommends a "downward variance pursuant to 18 U.S.C. § 3553(a) to reach the recommended sentence." The presentence report identifies three basis for the variance (1) lack of any known prior arrests, (2) compliance while on pre-trial release, and (3) his financial support of his family. However, the presentence report provides no support for a variance based on these three basis. It is noteworthy that the defendant's lack of any known prior arrests is taken into account in the calculation of his Criminal History Category, which is I. His compliance while on pre-trial release and providing financial support for his family are not out of the ordinary, many defendants are similarly situated in this regard.

There must be a valid factual and legal basis for reducing a sentence. It cannot be a whimsical reduction. The defendant is facing a sentencing guideline range of 121 to 151 months because of the crimes he committed and his refusal to accept responsibility for his actions. His sentencing range would be much lower had he admitted guilt and received the benefits of reductions in his offense level for acceptance of responsibility and a reduction pursuant to U.S.S.G. § 5K2.0, unaccounted for circumstances. These reductions would have resulted in an adjusted offense level of 25, with a sentencing range of 60 to 74 months.[9] There does not appear to be a factual and legal basis for reduction of the sentence at this time.

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is a factor to be considered in

---

[9] The recommended sentencing range for a base offense level 25 and criminal history category I is 57 to 71 months incarceration. However, the sentencing range of 60 to 74 months reflects the government's last offer, which was rejected by the defendant.

imposing sentences. The Ninth Circuit has recognized that there will be differences between defendants who accept fast-track pleas and those who do not. Such differences are not improper. "Sentencing disparities between fast-track and non-fast track defendants under 18 U.S.C. § 3553(a)(6) are not unwarranted because the differences in those sentences 'are justified by the benefits gained by the government when defendants plead guilty early in criminal proceedings.'" *United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015)(quoting *United States v. Gonzalez-Zotelo*, 556 F.3d 736, 739 (9th Cir. 2009)(internal quotation marks omitted).[10] "Congress [has] authorized the fast-track program and, thus, [has] authorized disparities between fast-track and non-fast track defendants." *Id*. The defendant in this case is a non-fast track defendant, therefore, a disparity with fast-track defendants is not unwarranted.

In fact, in *Gonzalez-Zotelo*, 556 F.3d 739-42, the Court held that the district court committed plain error by giving the defendant, who did not have a fast-track plea, the same sentence given earlier that day to a defendant with a fast-track plea, based on a perceived disparity.

Whether or not a defendant has accepted responsibility for his crime is a factual determination reviewed for clear error. *United States v. Gonzalez*, 897 F.2d 1018, 1019 (9th Cir. 1990). It is the defendant's burden to demonstrate acceptance of responsibility. *United States v. Ochoa-Gaytan*, 265 F.3d 837, 843 (9th Cir. 2001). "[A] defendant's choice to exercise the constitutional right to trial and thus to hold the government to its burden-even where the defendant does not bring a constitutional challenge-does not automatically make the defendant ineligible for the adjustment. The 'exercise of a constitutional right cannot be held against a defendant for the purpose of the adjustment [of acceptance of responsibility], although it may reduce the amount of evidence in his favor.'" *Id.* quoting *United States v. Vance,* 62 F.3d 1152, 1157 (9th Cir. 1995). Although, the court is free to discount the defendant's belated expressions of remorse following his

---

[10] One of the benefits the government receives in a written plea agreement is a waiver of appeal.

conviction. See *United States v. Restrepo*, 930 F.2d 705, 710 (9th Cir. 1991).  Furthermore, there was no error where district court explicitly stated that its denial of section 3E1.1 adjustment was based on defendant's steadfast assertion of innocence during and after trial, rather than his decision to go to trial. *Gonzalez*, 897 F.2d at 1020.

"[The] adjustment [for acceptance of responsibility] is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted and only then admits guilt and expresses remorse..." U.S.S.G. §3E1.1, appl. note 2.  At trial the defendant did more than just put the government through its burden of proof.  He presented a factual defense to the element of knowledge.

This defendant is not similarly situated to any other defendant in this investigation. Twenty-one defendants were charged, the government dismissed charges on two defendants, one became a fugitive before pleading guilty, seventeen defendants plead guilty pursuant to written plea agreements, wherein they accepted responsibility for their actions and by doing so the government gained the benefit of an appeal waiver and the savings of significant resources.

Many of the defendants in this case initially denied knowing that the manufacture and distribution of synthetic cannabinoids was illegal.  However, they ultimately agreed that they knew it was illegal to manufacture and/or distribute the synthetic cannabinoids. However, the defendant has been steadfast in his position that he was unaware what he was distributing was illegal and is the only one who chose to go to trial.

Additionally, other defendants provided varying degrees of assistance to the government.  Those individuals received the benefit of their cooperation, which was reflected in a downward variance in their sentences. This defendant did not provide any assistance to law enforcement.

In looking to a case where a defendant is similarly situated to this defendant, in that the defendant went to trial and was convicted, the Court can look to *United States v. Khaled Al Haj, et al*. (16-CR-243) a case in the Western District of Texas.  In this case Khaled Al Haj (hereinafter "Al Haj") supplied and distributed the same synthetic cannabinoids as this

- 10 -

defendant. Al Haj supplied and distributed the synthetic cannabinoids in the Fort Worth area of Texas. Both defendants, Alghaithi and Al Haj, had the same source of supply, Naji Abdulkhaleq and Madji Khaleq ("Khaleq"). A jury convicted Al Haj of Count One, Conspiracy to Distribute a Controlled Substance, in violation of 21 U.S.C. § 846, and Count Two, Conspiracy to Distribute a Controlled Substance Analogue, in violation of 21 U.S.C. § 846. (16-CR-243, Doc. 198.) Al Haj was sentenced to 180 months imprisonment followed by three years of supervised release on each count. The sentence on Count Two is concurrent to the sentence imposed in Count One. (16-CR-243, Doc. 471.)

It is the government's position that this defendant, Alghaithi and Al Haj, are similarly situated. Both defendants communicated directly with Khaleq to place orders of synthetic cannabinoids to be distributed. Both defendants paid Khaleq for the synthetic cannabinoids, and both defendants had the synthetic cannabinoids shipped to them from California.[11]

For another example of a similarly situated defendant, this Court can look to *United States v. Michael Rocky Lane et al*., 12-CR-1419, a District of Arizona, Phoenix Division, case in which the defendant, Michael Rocky Lane, was convicted after a jury trial. He was convicted of Count One, Conspiracy to Manufacture or Distribute a Controlled Substance Analogue, in violation of 21 U.S.C. § 846, Count Three Conspiracy to Manufacture or Distribute a Controlled Substance Analogue, in violation of 21 U.S.C. § 846, and Count Five, Possession, or aiding and abetting in the Possession with Intent to Distribute a Controlled Substance Analogue. (12-CR-1419-PHX, Doc. 465.) The defendant was sentenced to 180 months imprisonment on each count followed by three years of supervised release. (12-CR-1419, Doc. 566.) The sentences imposed on Counts Three and Five are concurrent with the sentence imposed in Count one. (*Id*.)

/ / /

---

[11] The manufacturing warehouse for the synthetic cannabinoids was located in Long Beach California.

*Forfeiture of 3975 E. Agate Knoll and the Chevy Spark*

There is no issue regarding the defendant's forfeited interest in these properties. However, the defendant's wife, the petitioner, claimed an interest in the properties. This issue is currently pending in a separate matter before this court.[12]

Upon a conviction for Conspiracy to Distribute Controlled Substance Analogues, in violation of 21 U.S.C. §§ 846 and 813, the defendant, "shall forfeit to the United States…any property constituting, or derived from, any proceeds the [defendant] obtained, directly or indirectly, as the result of such violation…[and] any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation." 21 U.S.C. § 853(a)(1) and (2).

The jury found that 3975 E. Agate Knoll and the Chevy Spark are subject to forfeiture and the Court entered a Preliminary Order of Forfeiture.

During the course of the investigation, and trial, it was determined that the retail distribution of synthetic cannabinoids typically occurred within a store, in this particular case it was the Chihuahua Market. The sale of synthetic cannabinoids almost always occurred using cash. The defendant would also use cash to pay the source of supply for additional synthetic cannabinoids.

The source of supply shipped thirteen separate packages to the defendant at 3975 E. Agate Knoll. It is uncontested that each of those packages contained synthetic cannabinoids. It is also uncontested that the synthetic cannabinoids from those packages were sold in the Chihuahua Market by either the defendant or another individual. The defendant admitted that he did not receive any other shipments of items to be sold in the market at 3975 E. Agate Knoll. It is the government's position that the residence at 3975 E. Agate Knoll facilitated the conspiracy to possession with intent to distribute controlled substances and controlled substance analogues. Therefore the residence should be forfeited to the United States.

---

[12] The government objected to the magistrate's Report and Recommendation to grant the petitioner's motion for summary judgment. (ECF 351 and 352.)

Similarly, the Chevy Spark was used to facilitate the conspiracy to possession with intent to distribute controlled substances and controlled substance analogues. The defendant admitted that the Spark was his vehicle and that he would use the Spark to transport the synthetic cannabinoids from 3975 E. Agate Knoll, to the storage unit and/or to the Chihuahua Market. He would also use the Spark to transport the proceeds of the sales of synthetic cannabinoids from the Chihuahua Market to 3975 E. Agate Knoll. Therefore, the Spark should be forfeited to the United States.

***Reimbursement of attorney's fees to the Criminal Justice Act Fund***

This issue is also pending before the court in separate filings. (ECF 336.) It is the government's position that the $50,795 is not an insignificant amount of money. This sum of money may significantly change the defendant's financial circumstances, which may affect his "current ability to repay the government for his attorney fees." See *United States v. Seminole*, 882 F.2d 441, 444 (9th Cir. 1989). Additionally, the determination of what, if any, sum of money is to be paid to reimburse the Criminal Justice Act Fund is an administrative function of the court. *Untied States v. Walton*, 693 F.2d 925 (9th Cir. 1982.)

***Sentencing recommendation***

The government recommends the following sentences: on Count One, Conspiracy to Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (B)(1)(c) the government recommends 121 months' imprisonment followed by 3 years of supervised release; on Count Two, Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 841(a)(1) and (B)(1)(c) the government recommends 121 months' imprisonment followed by 3 years of supervised release, and; on Count Three, Conspiracy to Possession with Intent to Distribute Controlled Substance Analogues, in violation of 21 U.S.C. §§ 846, 813, and 841(a)(1) and (B)(1)(c) the government recommends 121 months' imprisonment followed by 3 years of supervised release. The government recommends the sentences imposed in Counts Two and Three run concurrent to the sentence imposed in Count One, for a total sentence of 121 months'

imprisonment followed by three years of supervised release. The government further recommends an appropriate fine as determined by the Court. It is the government's position that this sentence will satisfy all of the goals of sentencing.

Respectfully submitted this 21st day of Otober, 2019.

                                         MICHAEL BAILEY
                                         United States Attorney
                                         District of Arizona

                                         *s/ Matthew G. Eltringham*
                                         MATTHEW G. ELTRINGHAM
                                         Assistant U.S. Attorney

Copy of the foregoing served electronically
or by other means this 21st day of October, 2019, to:

Thomas F. Jacobs, Esq.